We have four argued cases today. The first one is number 15-5006, Dimare Fresh v. United States. Counsel, ready to proceed? Yes, Your Honor. Mr. Turner? Thank you, Your Honor. You're reserving three minutes. Thank you. I may lapse over, but whatever I have left, I'll be glad to take. Your Honor, Stephen Turner of Tallahassee for the tomato producer claimants here this morning. We ask reversal of the dismissal of our complaint for regulatory taking resulting from the FDA's action classifying the perishable tomatoes of our clients as unsafe and publicly warning over a prolonged period that the tomatoes presented a hazardous danger of salmonella contamination and were unsafe to consume even if washed. Which actions caused the tomatoes to be unmarketable, lose all value when their shelf life expired? The federal claims judge ruled that a taking was not plausible because the government's action had no legal effect on the tomatoes, even though the government's actions were a regulatory means intended to stop sale and distribution of the tomatoes pending the government's investigation of the source of suspected contamination. Would sale of the tomatoes have been illegal? I beg your pardon? Would sale of the tomatoes have been illegal? If they were in fact contaminated, yes, sir, they would have been. Based on what the government said, would sale have been illegal? They would have been sold in the face of a warning of contamination, and yes, sir, illegal, they would have been punishable. It would have been punishable to sell those tomatoes? It would have been if they had been diseased, yes, sir. As it stood? As it stood? Would there have been any punishable action if those tomatoes had been sold? No, I suppose not, as it turned out, since they weren't diseased and there were no diseased tomatoes. But the fact was nobody knew what was going on because the information was held confidential by the government. Mr. Turner, let me see if I understand the breadth of your argument because my concern is with the potential sweep of an argument that warnings without official coercion or regulatory restriction imposed seems to be a different kettle of fish from what we've typically dealt with in the takings area. There are an awful lot of government warnings, whether it's the Surgeon General on cigarettes or whether it's warnings about airbags potentially unsafe. A warning from Homeland Security, for example, that there is a threat of a bomb on a transatlantic flight. I mean, does Delta Airlines in that situation have a cause of action for a taking? Assume for a moment that it turns out that there was no bomb and indeed the basis for the warning was thin, but nonetheless it was in good faith. I'll furnish you the statute on terrorist attacks because there's a statute on that. But each case would have to be examined and you'd have to look at what was intended and what was the purpose here, what the property interest was, what the effect was. The flights can be rescheduled, for example. Events can be rescheduled. You have to see what happened. Here we had an intentional act. Right, but the seats on that flight can't be rescheduled. So if the airline loses all the passengers for that flight and loses all the money from that, how is that distinguishable from the situation you're arguing? I don't know that that wouldn't be a taking. I doubt it. In the circumstances, I think you're entitled to look at what happened. I don't think that particular instance would amount to it. It may not be enough damage to the property. I don't know the situation, Your Honor. I can't speculate. I think the case law deals with what we've got here. And in this circumstance, we've got a distinct regulatory action directed to these tomatoes, intended to suspend the market, intended to stop their sale, and it does have that effect. And it wouldn't make any difference whether it was a prohibition or whether it was an order of this nature. Indeed, this was an order entered. This action was taken under the regs as I furnished the court. It was the means, it was probably the most available means to the FDA to take this kind of an action. It was the least, it was the most effective under one of the regs that I furnished. I think it was 21-7.42. It was the means that they showed when there was no other means to accomplish their purpose. This was the means they wanted. And they did that. I'm sorry, Your Honor. Go ahead. Well, the case law says we look at the circumstances of each individual case and we examine the factors underpin central. Yeah, but that's not, to me, that's not really very helpful in trying to tease apart the kinds of, in this case, let's say, from a great bulk of cases, some of the examples that we talked about earlier. I mean, suppose, let's take another one which seems to me maybe close to the tomato case. The Surgeon General says sugary soft drinks are very bad for your health. Now, that's a warning. It says school children in particular should not be drinking sugary soft drinks. Is that a taking from the soft drink manufacturers? Because there's going to be a loss, presumably, if anybody listens to the Surgeon General, there's going to be a loss of sales. That's an informational, neutral publication, release of information, of scientific, perhaps controversial information. That is not a targeted device or regulatory means. Why is that not as targeted as this? You're targeting the soft drink industry and you're saying soft drinks sold in schools are bad for the health of children. That sounds targeted to me. I just believe that the government has the right to release information that would not be a taking unless it was intended. It's intended if they decide to. I don't think so. I think that would be a neutral publication of scientific information that is not considered, is furnished in the capacity of enlightening the public. We're not doing that here. How is the government's warning, it's an initial reaction to people getting sick and they want to stop it. How is that not neutral? It's not neutral because what's the difference between that and saying don't sell? They know the result is going to be in the regulations. What's the difference between saying you shouldn't buy sugary soft drinks and saying don't sell? Because that is not directed to the property and intended to stop the taking. I'm sure it is. A lot of these companies, suppose you're a local company and your business is putting soda machines in public schools. And the Surgeon General comes out and says don't sell these to kids. And all the school systems, based on that, remove the soda systems. That local business has lost its business. Isn't that precisely the same? Sorry, Your Honor. If they had the enforcement power to back that warning up, it might be. If they had the enforcement power to back that up. What difference does that make? What's the difference? Because the cases provide for that. And when you get into the FAA cases, the Flowers Mill case and the cases that Brenneman and the others cases that rely on that, you see that the cases say when you don't have the power to back it up, when you just have a naked advisory power, that's not a taking. Or that can't be a taking. But when you have this power that FDA had to enforce their orders, when you know that the order can be enforced, when you know that there's penalties associated with what can happen, when you can induce the fear, that's just like this court's A&D decision saying the government can coerce. Here what we've got is a dissuasion coerce, which is even less because businessmen are risk averse. They simply don't buy. You're dealing, by the way, with bulk buyers. You're not dealing with a consumer in public. You're consuming with bulk buyers who have no information and sellers, by the way. The sellers don't want to distribute either because you have no information other than what the government has given you that tells me this is dangerous. And no one is going to consume it. I'm not going to sell it. I'm not going to buy it. And the market is frozen. It's a perishable product. Mr. Turner, how many states produce tomatoes? Well, in this case, it was focused on this region, which primarily is Florida, Your Honor. Well, it seems to me the record showed that what they said was tomatoes from certain states are safe. What it boiled down to was Florida tomatoes. There were some in Georgia and I think a few in California in that area, but it was basically Florida providers that lost these three varieties of tomatoes and they lost the crop for that year. Another problem is this is a delayed long enough to kill the property, to cause the property to perish. It was not simply a warning that was corrected. And the evidence of how it took place, of whether it could have been prevented, of whether it stayed in effect a long time, There's criticism here that the evidence would show that they did not use industry traceback sources. There is a problem here that needs to be examined and the interest and the evidence explored to determine the character of the taking. That's what we're talking about. The character of the government's action, which is to be considered as part of the Penn Central analysis. And we have to look at all the factors. This is not the only case where a prohibition has not been the issue. There are other cases where the courts come in. You're not suggesting that the government acted unlawfully here, are you? I beg your pardon? You're not suggesting the government acted unlawfully here, are you? No, they have authority to act, Your Honor. They have to have authority to act to be a taker. I mean, all this stuff about its delay and things like that, I don't understand how it has any relevance to a taking theory. It goes to the character of the action. It goes to what was done. Why does that make sense? Isn't the character of the action directed to whether the government action actually took the property? Well, if it could have been avoided, that might be a factor. For example, if there had been necessity here, that would have been an extremely important factor. If the government determined that the railroad lines running north out of Florida were in some fashion unsafe and, as a consequence, delayed the shipment of the tomatoes for a month, would that be a taking? If they had determined the rail line was unsafe? That's right. And you were unable to ship. And the line was not safe. And the line was safe or wasn't safe. What's the difference? It's a lot of difference, Your Honor. If you have a necessity, the government has a justification for its actions. I don't understand at all how that relates to a taking theory. I mean, the government may have a necessity to take somebody's property to put a rail line through it. They're entitled to do that. It's clearly proper, but it's still a taking and they still have to pay just compensation. Whether the government was correct or not in taking an action is irrelevant to the taking. The question is whether the government took some property, of course. Judge, I don't want to dispute the court, but there's a doctrine called the doctrine of necessity. And that is a big factor at play in these declarations of emergency. And if you have a necessity, and this court wrote about this, by the way, in 2013. Well, let me ask a hypothetical on that then. So suppose you have what you call the doctrine of necessity, and instead of issuing a warning, the FDA orders your producers to destroy the tomatoes. Since it was a necessity, because let's assume they were contaminated, do you not have a taking theory then because it was a necessity? No. If it is a true necessity, an actual necessity, you do not have – to prevent a public danger, you do not have a taking. Under the doctrine called the necessity doctrine, which this court – this court wrote about the necessity doctrine and the government's attempt to overuse that doctrine in a 2013 case, and it slips my mind right now, but I'll provide it to you in rebuttal. Well, let me just say one question, follow-up to Judge Hughes' question. Are you saying that if it had turned out that the tomatoes were in fact infected, then there would be no taking? Are you also saying that if the government had acted entirely reasonably, so that there was very high likelihood that the Florida tomatoes were the source of a salmonella infection, but it turns out surprisingly that they weren't, would that be a taking? That would have to be examined as part of the factors that I think that would be – all of that would be an issue that we would have to look at and balance under Penn Central, Your Honor. That's a balance. If the tomatoes were diseased, you would have a nuisance defense. Right, but if they're not in fact diseased, but if the government was acting responsibly with no negligence and its decision to issue a warning was entirely justified, are you saying that would be qualified as a taking? It might be, except that Trinco, the Trinco case, talks about the doctrine of necessity of when you can use it and when you can't. And if there was an actual necessity and you were taking preventative actions to prevent the danger, for example, if you were – I guess my question comes as to what an actual necessity is. Is it an actual necessity if it turns out after the fact that there wasn't a problem, even though it was reasonable to assume that there was? Under Trinco, this court's decision, it would not be. It would not be. You must have an actual necessity in fact. It wouldn't be a necessity, so it wouldn't qualify potentially as a taking. That's right. And why should it? Why should a few suffer when the government makes – government takes action in an attempt to justify, in an attempt to protect the public? But it's wrong. Why should a few people suffer here and why shouldn't the public pay for the fact that the government has exercised its regulatory authority to cause the problem here of our loss? That's the issue. Your time's up. Thank you, Your Honor. Appreciate it. I'll give you a minute. Mr. Lofgraven? Give Mr. Lofgraven an extra minute to – May it please the Court? The tomato producers cannot state a claim for a compensable regulatory taking because they, one, do not identify a regulation and do not identify any property interest that was taken. As the trial court found – Supposing that warning was in effect for a year, would that make any difference? Well, it's a warning. So by virtue of a warning, it has no impact on the plaintiff's property rights. There's no impact on the plaintiff's rights to use their tomatoes, to sell them, to buy them, to dispose them, to do whatever they want with them. There is nothing that an FDA news release did that took by regulation – Any warning, no matter how severe and or inaccurate, can't create liability? If that warning – well, a warning doesn't take property rights. I think that's what it boils down to here. There must be a restriction on the property. There must be something that the tomato producers could do before the FDA issued a press release or a warning and something that they couldn't do afterwards. And there is nothing of that sort here. They were still entitled to sell their tomatoes and purchasers were entitled to buy them. The authorities that plaintiffs cite do not support their claim. They don't cite a single case in which the court found that a warning, that information disseminated to the public was sufficient to state a claim for a regulatory taking. Now, your position in your brief and now reiterated here seems to be that there has to be a regulation or statute that prohibits the action that's in question by the person that alleges to have been the victim of a taking or effectively appropriates the property of that person. But what about cases – I'm wondering whether that isn't too narrow a test. What about cases such as the auto dealers case or the Yuba case in which there's action that may be coercive in nature but is not directed or specifically authorized by regulation or statute? A threat to bring litigation, pressure on contract parties that the government employs that is deemed to be coercive but isn't regulatory or statutory in nature. Wouldn't that qualify as the basis for a taking? Well, under certain circumstances when there is some sort of restriction, like I think you mentioned Yuba Goldfield. In that case, the Corps of Engineers sent the plaintiffs a letter saying you are prohibited from mining on this property. But that letter was not the product of any regulatory authority to prohibit, I take it. I mean, they were simply saying we're going to threaten you with a lawsuit, right? There are certain – But that would be the predicate for a taking, would it not? Well, the court found that it was in that case. And in A&D Auto Sales, the court found that a requirement, something that was alleged to be mandatory, it was mandatory that the dealer terminations take place and as a condition of the government financing. So you're not really wedded to the regulation or statute line that you drew in the brief, right? We said that that was a principle. That would seem to be a common theme in every single case. And when there wasn't necessarily a formal rulemaking or regulation, there was a theme of prohibition. I mean, if the government sends you a letter saying – Right, coercive action on the part of the government. So the regulation and statute apply in every case except those in which it doesn't, they don't apply. Well, there are certainly exceptions. So if in this case the FDA, instead of issuing a warning, had said we have some issues or some problems, we think the problem is these tomatoes, you know, these tomatoes are not to be sold. They didn't actually seize them, they didn't order the producers to destroy them, but they ordered them not to sell. Would that be a taking? I don't know if it would be a taking. That might be a situation in which a factual record could be developed. In this case, no factual record could be developed that would support a claim that these two press releases in which the government says FDA recommends, FDA advises, the complaint alleges, you know, FDA publicized, FDA warrants, but there's nothing that says FDA restricted us from selling tomatoes. And Mr. Turner acknowledged that. There is no restriction on his client's ability to sell their products. The court has no further questions. We defer to our briefs and respectfully request that the trial court's judgment be affirmed. Mr. Turner, you've got a minute. Judge, I just would like to say that these were sophisticated buyers and sellers. This is not the consumer. You poisoned the market. You knew you poisoned the market. You knew nobody would sell. That had a coercive influence on those people. And both the seller, who stopped shipments, and the buyers who canceled orders. They knew this was the intent and nobody would sell. And fortunately, we just couldn't hold these tomatoes forever because they have a shelf life. If the court has no further questions... I actually do have a question. What do you think is your strongest case? I wasn't able to find any case that actually dealt with a pure warning. What do you think is the strongest authority you have for either covering a warning situation or giving you the basis for an argument that takings ought to be extended to warnings? Well, I don't think the warning is peculiar. I think the case law says the novelty of all these things has to be explored. Right, but let me ask you first, very specifically. There isn't a warning case out there, is there? Well, there is actually. There are some cases that are so close. But Morton-Thiokol case that I quote is very close in the brief where the government takes the position and they announce a position and they say this would be wrong, in effect, which is in the nature of a type of warning. And the court says no businessman is going to risk this event, as Yuba does too, by the way. No businessman is going to risk this situation and require anything formal. So Yuba and Morton-Thiokol you think would be the strongest cases? I think those two. I think the AAA pharmacy case, Delaware case where the government tells tenants to get out. I mean, they don't have any authority. They just tell them and they leave. So the government can take action which is intended to cause a loss of property or which they can foreseeably will cause a loss of property. In this circumstance, we want the opportunity to prove that they knew it, that it had that intent,  and it caused a problem that we should not have to bear. That's the key. Thank you so much, Ron. Thank you, counsel.